RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THEODORE JOSEPH ROBERTS, RANDALL DANIEL, and
SALLY O'BOYLE, on behalf of themselves and all
others similarly situated,

*Plaintiffs-Appellants*,

> No. 20-5465

*v.*

ROBERT D. NEACE, in his capacity as Boone County
Attorney, ANDREW G. BESHEAR, in his official
capacity as Governor of the Commonwealth of
Kentucky, ERIC FRIEDLANDER, in his official capacity
as Acting Secretary of the Cabinet for Health and
Family Services,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00054—William O. Bertelsman, District Judge.

Decided and Filed: May 9, 2020[*]

Before: SUTTON, McKEAGUE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEFS:** Christopher Wiest, CHRIS WIEST, ATTORNEY AT LAW, PLLC, Crestview
Hills, Kentucky, for Appellants; Barry L. Dunn, OFFICE OF THE KENTUCKY ATTORNEY
GENERAL, Frankfort, Kentucky for Amicus Curiae in support of Appellants. Jeffrey C. Mando,
ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellee
Neace. S. Travis Mayo, Taylor Payne, OFFICE OF THE GOVERNOR, Frankfort, Kentucky,
Wesley W. Duke, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky,
for Appellees Beshear and Friedlander.

───────────

[*]This decision was originally filed as an unpublished order on May 9, 2020. The court has now designated
the order for publication.

————————————

**ORDER**

————————————

PER CURIAM.  Three congregants of Maryville Baptist Church wish to attend in-person worship services this Sunday, May 10.  By order of the Kentucky Governor, however, they may not attend "faith-based" "mass gatherings" through May 20.  Claiming that this limitation on corporate worship violates the free-exercise protections of the First and Fourteenth Amendments to the United States Constitution, the congregants seek emergency relief barring the Governor and other officials from enforcing the ban against them.  The Attorney General of the Commonwealth supports their motion as amicus curiae.  The Governor and other officials oppose the motion.

Governor Beshear has issued two pertinent orders arising from the COVID-19 pandemic. The first order, issued on March 19, prohibits "[a]ll mass gatherings," "including, but not limited to, community, civic, public, leisure, faith-based, or sporting events."  R. 1-4 at 1.  It excepts "normal operations at airports, bus and train stations, . . . shopping malls and centers," and "typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing."  *Id.*

The second order, issued on March 25, requires organizations that are not "life-sustaining" to close.  R. 1-7 at 2.  The order lists 19 broad categories of life-sustaining organizations and over a hundred sub-categories spanning four pages.  Among the many exempt entities are laundromats, accounting services, law firms, hardware stores, airlines, mining operations, funeral homes, landscaping businesses, and grocery stores.  Religious organizations do not count as "life-sustaining," except when they provide "food, shelter, and social services." *Id.* at 3.

On April 12, Maryville Baptist Church held an Easter service.  Some congregants went into the church.  Others parked their cars in the church's parking lot and listened to the service over a loudspeaker.  Kentucky State Police arrived in the parking lot and issued notices to the congregants that their attendance, whether in the church or outdoors, amounted to a criminal act.

The officers recorded congregants' license plate numbers and sent letters to vehicle owners requiring them to self-quarantine for 14 days or be subject to further sanction.

Theodore Joseph Roberts, Randall Daniel, and Sally O'Boyle all attended this Easter service, and they all complied with the State's social-distancing and hygiene requirements during it.  At some point during the service, the state police placed attendance-is-criminal notices on their cars.  In response, the three congregants sued Governor Beshear, another state official, and a county official, claiming that the orders and their enforcement actions violate their free-exercise and interstate-travel rights under the U.S. Constitution.

The district court denied relief on the free-exercise claim and preliminarily enjoined Kentucky from enforcing its ban on interstate travel.  The congregants appealed.  They asked the district court to grant an injunction pending appeal on the free-exercise claim, but the court refused.  The congregants now seek an injunction pending appeal from our court based on their free-exercise claim.

Two other cases, challenging the same ban, have been making their way through the federal district courts of Kentucky.  In contrast to the district court in this case, they both preliminarily granted relief to the claimants based on the federal free-exercise claim.  On May 8, a district court from the Western District of Kentucky issued an order preliminarily enjoining the Governor from enforcing the orders' ban on in-person worship with respect to the same church at issue in our case. *Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-cv-278-DJH-RSE (W.D. Ky. May 8, 2020).  That same day, a district court from the Eastern District of Kentucky reached the same conclusion in an action involving a different church. *Tabernacle Baptist Church, Inc. of Nicholasville, Kentucky v. Beshear*, N. 3:20-cv-00033-GFVT (E.D. Ky. May 8, 2020).  In doing so, it observed that "the constitutionality of these governmental actions will be resolved at the appellate level, at which point the Sixth Circuit will have the benefit of the careful analysis of the various district courts, even if we disagree." *Id.* at 5.

This is not our first look at the issues.  Last week, we granted relief in the case from the Western District of Kentucky with respect to drive-in services and urged the district court and parties to prioritize resolution of the more difficult in-person aspects of the case.  *Maryville Baptist Church, Inc. v. Beshear*, -- F.3d --, 2020 WL 2111316 (6th Cir. May 2, 2020).  We are grateful for their input.  In assessing today's motion for emergency relief, we incorporate some of the  reasoning (and language) from our earlier decision.

We have jurisdiction over this appeal.  "Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions" are immediately appealable.  28 U.S.C. § 1292(a)(1).  Under the circumstances, this order operates as the denial of an injunction.  And no one can fairly doubt that this appeal will "further the statutory purpose of permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence."  *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).  At least four more worship services are scheduled on the Sundays and Wednesdays between today and May 20, when the Governor has agreed to permit places of worship to reopen.  Lost time means lost rights.

We ask four questions in evaluating whether to grant a stay pending appeal:  Is the applicant likely to succeed on the merits?  Will the applicant be irreparably injured absent a stay?  Will a stay injure the other parties?  Does the public interest favor a stay?  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

*Likelihood of success.*  The Governor's restriction on in-person worship services likely "prohibits the free exercise" of "religion" in violation of the First and Fourteenth Amendments.  U.S. Const. amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  On one side of the line, a generally applicable law that incidentally burdens religious practices usually will be upheld.  *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990).  On the other side of the line, a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be "justified by a compelling interest and is narrowly tailored to advance that interest."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993).

These orders likely fall on the prohibited side of the line.  Faith-based discrimination can come in many forms.  A law might be motivated by animus toward people of faith in general or one faith in particular.  *Id.*  A law might single out religious activity alone for regulation. *Hartmann v. Stone*, 68 F.3d 973, 979 (6th Cir. 1995).  Or a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities.  *See Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365–67 (3d Cir. 1999).

Were the Governor's orders motivated by animus toward people of faith?  We don't think so.  The initial enforcement of the orders at Maryville Baptist Church no doubt seemed discriminatory to the congregants.  But we don't think it's fair at this point and on this record to say that the orders or their manner of enforcement turned on faith-based animus.

Do the orders single out faith-based practices for special treatment?  We don't think so. It's true that they prohibit "faith-based" mass gatherings by name.  R. 1-4 at 1.  But this does not suffice by itself to show that the Governor singled out faith groups for disparate treatment.  The order lists many other group activities, and we accept the Governor's submission that he needed to mention worship services by name because there are many of them, they meet regularly, and their ubiquity poses material risks of contagion.

Do the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws?  We think so.  As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law.  *Ward*, 667 F.3d at 738.  "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny."  *Id.* at 740.

The Governor insists at the outset that there are "no exceptions."  ROA (20-5427) 13-1 at 25.  But that is word play.  The orders allow "life-sustaining" operations and don't include worship services in the definition.  And many of the serial exemptions for secular activities pose comparable public health risks to worship services.  For example:  The exception for "life-

sustaining" businesses allows law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses to continue to operate so long as they follow social-distancing and other health-related precautions. R. 1-7 at 2–6. But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of the other services.

Keep in mind that the Church and its congregants just want to be treated equally. They don't seek to insulate themselves from the Commonwealth's general public health guidelines. They simply wish to incorporate them into their worship services. They are willing to practice social distancing. They are willing to follow any hygiene requirements. They do not ask to share a chalice. The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same.

Come to think of it, aren't the two groups of people often the *same people*—going to work on one day and going to worship on another? How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one.

Some groups in some settings, we appreciate, may fail to comply with social-distancing rules. If so, the Governor is free to enforce the social-distancing rules against them for that reason and in that setting, whether a worship setting or not. What he can't do is assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings. We have plenty of company in ruling that at some point a proliferation of unexplained exceptions turns a generally applicable law into a discriminatory one. *See, e.g.*, *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 165–70 (3d Cir. 2002); *Fraternal Order of Police*, 170 F.3d at 365; *see also Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196–98 (2d Cir. 2014).

We don't doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Commonwealth's citizens. *See Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). And we agree that no one, whether a person of faith or not, has a right "to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944). But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one.

Nor does it make a difference that faith-based bigotry did not motivate the orders. The constitutional benchmark is "government *neutrality*," not "governmental avoidance of bigotry." *See Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008). A law is not neutral and generally applicable unless there is "neutrality between religion and non-religion." *Hartmann*, 68 F.3d at 978. And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones. *See id.* at 979; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1233–35, 1234 n.16 (11th Cir. 2004); *see also Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus.").

All of this requires the orders to satisfy the strictures of strict scrutiny. They cannot. No one contests that the orders burden sincere faith practices. Faith plainly motivates the worship services. And no one disputes the Church's sincerity. Orders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law and by officers taking down license plate numbers, will chill worship gatherings.

At the same time, no one contests that the Governor has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus. The Governor has plenty of reasons to try to limit this contagion, and we have little doubt he is trying to do just that.

The question is whether the orders amount to "the least restrictive means" of serving these laudable goals. That's a difficult hill to climb, and it was never meant to be anything less. *See Lukumi*, 508 U.S. at 546. There are plenty of less restrictive ways to address these public-health issues. Why not insist that the congregants adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities? Or perhaps cap the number of congregants coming together at one time? If the Commonwealth trusts its people to innovate around a crisis in their professional lives, surely it can trust the same people to do the same things in the exercise of their faith. The orders permit uninterrupted functioning of "typical office environments," R. 1-4 at 1, which presumably includes business meetings. How are in-person meetings with social distancing any different from in-person church services with social distancing? Permitting one but not the other hardly counts as no-more-than-necessary lawmaking.

Sure, the Church might use Zoom services or the like, as so many places of worship have decided to do over the last two months. But who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name," Matthew 18:20, or what it means when "not forsaking the assembling of ourselves together," Hebrews 10:25; *see also On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *7–8 (W.D. Ky. Apr. 11, 2020).

As individuals, we have some sympathy for Governor DeWine's approach—to allow places of worship in Ohio to hold services but then to admonish all of them (we assume) that it's "not Christian" to hold in-person services during a pandemic. Doral Chenoweth III, *Video: Dewine says it's "not Christian" to hold church during coronavirus*, Columbus Dispatch, (Apr. 1, 2020). But the Free Exercise Clause does not protect sympathetic religious practices alone. And that's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it. *Smith*, 494 U.S. at 886–87.

The Governor suggests that the explanation for these groups of people to be in the same area—intentional worship—creates greater risks of contagion than groups of people, say, in an office setting or an airport. But the reason a group of people go to one place has nothing to do

with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another for similar lengths of time? It's not as if law firm office meetings and gatherings at airport terminals always take less time than worship services. If the problem is numbers, and risks that grow with greater numbers, there is a straightforward remedy: limit the number of people who can attend a service at one time. All in all, the Governor did not customize his orders to the least restrictive way of dealing with the problem at hand.

*Other factors.* Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Just so here. The prohibition on attending any worship service through May 20 assuredly inflicts irreparable harm by prohibiting them from worshiping how they wish. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). As for harm to others, an injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social-distancing rules in both settings. As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees. *See Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012).

In the week since our last ruling, the Governor has not answered our concerns that the secular activities permitted by the order pose the same public-health risks as the kinds of in-person worship barred by the order. As before, the Commonwealth remains free to enforce its orders against all who refuse to comply with social-distancing and other generally applicable public health imperatives. All this preliminary injunction does is allow people—often the same people—to seek spiritual relief subject to the same precautions as when they seek employment, groceries, laundry, firearms, and liquor. It's not easy to decide what is Caesar's and what is God's in the context of a pandemic that has different phases and afflicts different parts of the country in different ways. But at this point and in this place, the unexplained breadth of the ban on religious services, together with its haven for numerous secular exceptions, cannot co-exist

with a society that places religious freedom in a place of honor in the Bill of Rights:  the First Amendment.

The plaintiffs' motion for an injunction pending appeal is **GRANTED**.  The Governor and the other defendants are enjoined, during the pendency of this appeal, from enforcing orders prohibiting in-person services at the Maryville Baptist Church if the Church, its ministers, and its congregants adhere to the public health requirements mandated for "life-sustaining" entities.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk